**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Zekelman Industries Incorporated, et al., | No. CV-19-02109-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | **AND DEFAULT JUDGMENT** |
| Robert Wayne Marker, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' motion for default judgment and permanent injunction. (Doc. 31.) For the following reasons, the motion will be granted in part and denied in part.

I.    Background

On March 29, 2019, Plaintiffs initiated this action by filing an eight-count complaint, which includes federal claims under the Lanham Act and the Copyright Act and various state-law claims. (Doc. 1.)

For purposes of this order, the facts alleged in the complaint are assumed to be true, except as to damages. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").

Plaintiff Zekelman Industries Incorporated ("Zekelman") manufactures steel pipe and Plaintiff Z-Modular, LLC ("Z-Modular"), a subsidiary of Zekelman, "provides a one-stop shop for modular buildings and services" marketed to real estate developers. (Doc 1

¶ 5.)  The modular buildings utilize a self-bracing structural system that is based upon "VectorBloc" construction technology.  (*Id*.)  According to Zekelman's advertising materials, the "VectorBloc" system uses bolts to join hollow structural sections with "VectorBloc corners" or "VectorBloc connectors"—cast steel L-shaped joints—which creates building modules that can be assembled from inside and stacked.  (Doc. 3-3 at 3-4; *see also* Doc. 1 ¶ 58.)

Zekelman registered the service mark "Z Modular" with the United States Patent and Trademark Office on February 6, 2018.  (Doc. 1 ¶ 15; Doc. 3 at 5.)  With Zekelman's approval, Z-Modular has used the Z Modular mark in commerce in the United States continuously since at least April 2017.  (Doc. 1 ¶ 17.)

Although "VectorBloc" has not been registered as a trademark or service mark,[1] Z-Modular owns common-law rights in the VectorBloc trademark and service mark.[2]  (Doc. 1 ¶ 24.)  Plaintiffs have used the VectorBloc mark in commerce continuously since September 2018 or earlier.  (*Id.* ¶ 25.)  Plaintiffs display a photograph of the VectorBloc connector and information about it on their webpage.  (*Id.* ¶ 26; Doc. 3-1 at 4.)

In June 2018, a marketing agency created two video advertisements for Zekelman's use, one entitled "Build Stronger Graphics" and the other entitled "Build Faster Graphics" (collectively, the "Copyrighted Works"), and transferred ownership to Zekelman.  (Doc. 1 ¶ 37.)  Both videos were copyrighted.  (*Id.* ¶¶ 38-39.)  One "features a modular steel unit outlined in red forming in the air and landing sturdily on the ground," and the other "features modular steel units being stacked vertically, a façade forming . . . , then the stack being repeated horizontally . . . , eventually forming a complex."  (*Id.*)  Zekelman and its

---

[1]  "[T]he only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001).  "Service marks and trademarks are governed by identical standards." *Id.*

[2]  Legal conclusions in the complaint are not taken as true for purposes of a motion for default judgment. *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1078 (C.D. Cal. 2012) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.")  However, the relevant facts alleged in the complaint (Doc. 1 ¶¶ 26-28) amply support this conclusion. *Chance*, 242 F.3d at 1156 ("[C]ommon law rights are acquired . . . by adopting and using the mark . . . .").

affiliates display the Copyrighted Works online.  (*Id.* ¶ 40.)

At least as of the date on which the complaint was filed, March 29, 2019, Defendant Robert Wayne Marker ("Marker") held himself out as engaged in services related to modular buildings.  (*Id.* ¶ 42.)  Marker used the names "Evo Micro Condos" and "Evo International" (collectively, "Evo") and operated the website www.evomicrocondos.com, but apparently no legal entity with those names ever existed.  (*Id.* ¶¶ 42-43, 45.)  In February 2019, Marker formed GreenFeet, Inc. ("GreenFeet"), which is the other defendant in this case.  (*Id.* ¶ 46.)

Neither Zekelman nor Z-Modular has any connection to or agreement with Marker, GreenFeet, or the apparently non-existent entity Evo.  (*Id.* ¶ 51.)  Nevertheless, through February 2019, the www.evomicrocondos.com website featured a photograph of a VectorBloc connector, which was taken from the Z-Modular website,[3] along with text identifying the connector as VectorBloc and describing how it works.  (Doc. 1 ¶ 59; Doc. 3-4 at 3 ["It all starts with the VectorBloc Connection"].)  The website also published the Copyrighted Works.  (Doc. 1 ¶ 60.)

The website also publicized an "Authorized Developer Program" and invited interested persons to click on a "contact us" hyperlink to receive more information.  (*Id.* ¶ 49; Doc. 3-7 at 12.)  Once contact was made, Marker invited the interested person to become a "dealer" and represented that Marker had a business relationship with Plaintiffs.  (Doc. 1 ¶¶ 49, 51.)

For example, on January 10, 2019, Marker sent an email (the "Jan. 10 email") to a prospective dealer entitled "Dealer Oppty Outline – Evo Micro Condos," inviting the prospective dealer to check out Evo's website at www.evomicrocondos.com and to check out Evo's "manufacturing partner's site at www.z-modular.com."  (Doc. 1 ¶¶ 49, 51; Doc. 3-9 at 2.)  On January 16, 2019, the prospective dealer's brother forwarded the Jan. 10 email to Plaintiffs.  (Doc. 3-9 at 2.)  On January 17, 2019, Plaintiffs' counsel sent Marker

---

[3]   Plaintiffs do not allege that the photograph of the VectorBloc connector was copyrighted.

a cease and desist letter.  (Doc. 1 ¶ 71; Doc. 3-11 at 2-3.)  Marker never responded.  (Doc. 1 ¶ 72.)

In March 2019, Marker began to edit his website at www.evomicrocondos.com, replacing the names "Evo International" and "Evo Micro Condos" with the name "GreenFeet Development."  (*Id.* ¶ 46.)  The website continued to publicize the "Authorized Developer Program."  (Doc. 3-8 at 3.)  GreenFeet has since "taken over" (or "jointly participates in") this endeavor.  (Doc. 1 ¶¶ 52, 54.)

Furthermore, "at some point," Marker "and/or" GreenFeet took an image from a frame of the Build Stronger Graphics video (one of the Copyrighted Works), altered it (by removing the color red and flipping the image horizontally), and posted the altered image on the website.  (Doc. 1 ¶ 61.)  The altered image existed on the www.evomicrocondos.com website as of March 5, 2019, at which point the website listed an address for GreenFeet.  (*Id.* ¶¶ 47, 61; Doc. 3-7 at 4.)

When the www.evomicrocondos.com website first became affiliated with GreenFeet, it still included a picture of a VectorBloc connector and information about VectorBloc connectors.  (Doc. 3-6 at 8.)  However, the website later stopped displaying the VectorBloc connector and instead advertised an "Innerloc Connector."  (Doc. 3-7 at 5.)  The image of the Innerloc Connector "is merely an edited image" of the "stolen photograph" of the VectorBloc connector.  (Doc. 1 ¶¶ 63-66.)

II.    Procedural History

As noted, on March 29, 2019, Plaintiffs filed this lawsuit.  (Doc. 1.)

A.    **Service Of Process**

Because a federal court lacks jurisdiction over a defendant who has not been properly served, the Court must "assess the adequacy of service of process on the party against whom default is requested" before entering default judgment.  *Golden Scorpio Corp. v. Steel Horse Saloon I,* 2009 WL 976598, *1 (D. Ariz. 2009).

On April 3, 2019, a process server served both Defendants by means of personal delivery to Jeanne Marker.  (Docs. 21, 22.)  This service was effective as to Marker because

he was living at the same residence as Jeanne Marker at the time of service. *See* Fed. R. Civ. P. 4(e)(2)(B); Ariz. R. Civ. P. 4.1(d)(2). This service was also effective as to GreenFeet because Jeanne Marker was its statutory agent. *See* Fed. R. Civ. P. 4(h)(1)(B); Ariz. R. Civ. P. 4.1(i).

B.     **Preliminary Injunction**

On April 15, 2019, Plaintiffs filed a motion for preliminary injunction and served it on GreenFeet (Doc. 23), but GreenFeet never responded. On May 14, 2019, the Court summarily granted the preliminary injunction as to GreenFeet.[4] (Doc. 26.) The Court also prompted Plaintiffs to seek entry of default. (*Id.* at 3.)

C.     **Entry Of Default And Motion For Default Judgment**

On June 19, 2019, Plaintiffs applied for entry of default (Doc. 29), which the Clerk entered the following day (Doc. 30).

On August 28, 2019, Plaintiffs moved for default judgment and sought a permanent injunction. (Doc. 31.)

On October 1, 2019, Plaintiffs served both Defendants with the application for entry of default, the Clerk's entry of default, and the motion for default judgment and permanent injunction. (Docs. 32, 33.) The process server personally delivered the documents to Marker. (*Id.*) Defendants never responded and have not participated in this litigation in any manner.

On March 23, 2020, the Court issued a tentative order concerning the motion for default judgment. (Doc. 37.)

On March 25, 2020, the Court held oral argument, via telephone, with Plaintiffs' counsel. (Doc. 38.)

///

///

_____

[4]     The Court noted that the motion for preliminary injunction was not properly served on Marker, because he was no longer living at the service address by the time the motion was filed (he apparently moved out after the complaint was served), but because the injunction bound GreenFeet and its agents, it had "the practical effect of enjoining Marker, too." (Doc. 26 at 2 n.1.)

III.     Analysis

   A.     **Default Judgment**

   The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

       1.     The First, Fifth, Sixth, And Seventh *Eitel* Factors

   In cases like this one, in which Defendants have not participated in the litigation at all, the first, fifth, sixth, and seventh factors are easily addressed.

   The first factor weighs in favor of default judgment. Prejudice to Plaintiffs is obvious—if the motion for default judgment were denied, Plaintiffs would be without other recourse for recovery. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

   The fifth and sixth factors weigh in favor of default judgment or are neutral. Due to Defendants' failure to participate, there is no dispute over material facts (except as to damages) and no indication that default is due to excusable neglect.

   The seventh factor generally weighs against default judgment, given that cases "should be decided on their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of Rule 55(b) of the Federal Rules of Civil Procedure, which authorizes default judgments, "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177. Put simply, "the default mechanism is necessary to deal with wholly unresponsive parties who could otherwise cause the justice system to grind to a halt. Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court." 2 Gensler, Federal Rules of Civil Procedure Rules and Commentary, Rule 55, at 119-20 (2020).

## 2. The Fourth *Eitel* Factor—The Amount Of Money At Stake

At first blush, the fourth factor—the amount of money at stake—seems to weigh against granting default judgment. Plaintiffs seek $639,774.25 (Doc. 31 at 8), which is a substantial sum. Moreover, none of the facts alleged in the complaint, taken as true, indicate that Plaintiffs actually lost any business as a result of Defendants' actions. Indeed, during oral argument, Plaintiffs' counsel acknowledged that Plaintiffs have no evidence of actual damage.[5]

"When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged." *Bd. of Trustees v. Core Concrete Const., Inc.*, 2012 WL 380304, *4 (N.D. Cal. 2012), *report and recommendation adopted,* 2012 WL 381198 (N.D. Cal. 2012). However, Plaintiffs seek damages for only three of their eight counts: two Lanham Act claims (Counts Two and Three) and one Copyright Act claim (Count Eight). (Doc. 31 at 8.) Additionally, with respect to Counts Two and Eight, Plaintiffs seek statutory damages, not actual damages. (*Id.*)

Under the Lanham Act, the Court has wide discretion to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a); *see also id.* § 1117(c)-(d) (allowing wide latitude "as the court considers just"). The Court, in exercising its broad discretion, may award only statutory damages and decline to award actual damages, to keep the sum more modest. *Media Lab, Inc. v. Collis*, 2010 WL 3893582, *6 (N.D. Cal. 2010). Under the Copyright Act, the Court similarly has wide discretion in assessing statutory damages. 17 U.S.C. § 504(c) (allowing "an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 *as the court considers just*") (emphasis added). Where the Court has the discretion

---

[5] Plaintiffs' counsel explained that, due to Defendants' refusal to participate in these proceedings, Plaintiffs have not been able to use to discovery process to identify evidence of damages. This is further evidence of prejudice to Plaintiffs and weighs in favor of granting default judgment. Nevertheless, the amount sought is high for a case where there may be no actual damage.

- 7 -

to reduce the monetary award to a less substantial sum that the Court considers reasonable, the fourth *Eitel* factor becomes neutral. *Twitch Interactive, Inc. v. Johnston*, 2018 WL 1449525, *8 (N.D. Cal. 2018).

### 3. The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claims and the sufficiency of the complaint. "These two factors are often analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (internal quotation marks omitted). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id*.

Here, these factors constitute the most complicated part of the analysis. Plaintiffs seek entry of default judgment on seven grounds, covering all eight counts of their complaint. (Doc. 31 at 14.) Unfortunately, Plaintiffs devoted less than half of one page of their default-judgment motion to the merits and sufficiency of the complaint, merely asserting in a conclusory fashion that the complaint pleads all the elements of all the causes of action. (Doc. 31 at 12.) This approach is understandable, given that Plaintiffs had already expended significant fees litigating this matter by the time the case reached the default-judgment stage and likely determined that it would be inefficient to continue pouring substantial resources into a case against potentially judgment-proof adversaries. Nevertheless, Plaintiffs' motion does not (1) identity the elements of each claim or (2) identify the facts alleged in the complaint that establish each element of each claim. Additionally, although Plaintiffs' earlier motion for a preliminary injunction did address, in some detail, why Defendants' conduct has resulted in a "likelihood of confusion" for purposes of the Lanham Act claims (Doc. 23 at 11-14), Plaintiffs have asserted a variety of different Lanham Act claims and none turns solely on whether a likelihood of confusion exists.

Given this backdrop, the Court will decline to assess the merits and sufficiency of Counts One, Four, Five, Six, and Seven of the complaint—the counts for which Plaintiffs

aren't seeking damages—and will deny, without prejudice, Plaintiffs' motion for a default judgment as to those counts. *See generally T-Cetra, LLC v. Guzman,* 2017 WL 7156250, *1 (C.D. Cal. 2017) ("[T]he Court denied without prejudice Plaintiff's motion for default judgment because Plaintiff failed (1) to set forth the elements of Plaintiff's claims with citations and legal support, and (2) failed to provide evidentiary support for the damages requested."); *Bank of New York Mellon v. Morandini,* 2018 WL 6788858, *1 (S.D. Fla. 2018) (emphasizing that "[a] default judgment is a matter of discretion for the court, not a matter of right to the moving party" and noting that the court had denied an earlier motion for default judgment without prejudice to the movant's ability to file a renewed motion that addressed the sufficiency of the claims in more detail).[6]  As for Counts Two, Three, and Eight, the Court will forge ahead and analyze the merits and sufficiency of each count.

### i.  Count Two

Count Two asserts a claim for counterfeiting of the Z Modular mark, in violation of "Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)."  (Doc. 1 ¶¶ 83-87.)

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys, Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citations and internal quotation marks omitted).  The second element, however, actually two subcomponents: "use" is distinct from "confusion." *Bosley Med. Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ("Infringement claims are subject to a commercial use requirement.").  *See generally 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005) ("Not only are 'use,' 'in commerce,' and 'likelihood of confusion' three distinct elements of a trademark infringement claim, but 'use' must be decided as a threshold matter because, while any number of activities may be 'in

---

[6]  Given this outcome, Plaintiffs are free to file a renewed motion for default judgment that addresses the sufficiency of Counts One, Four, Five, Six, and Seven in more detail. However, in light of the other relief being granted in this order, and in light of Plaintiffs' counsel's comments during the motion hearing, it seems unlikely that future litigation will be necessary.

commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark.").

Here, Plaintiffs' motion for preliminary injunction (which is the only filing that addresses the elements of trademark infringement) focuses on whether Defendants' conduct was likely to cause confusion. (Doc. 23 at 11-13.) The Court agrees with that analysis, but it doesn't address the antecedent question of whether Defendants engaged in a qualifying "use" of the Z Modular mark.

On that issue, it is notable that Defendants are not accused of placing the Z Modular mark[7] (or any imitation of it) anywhere on their website, advertising materials, or products. Such conduct would be the quintessential sort of "use" of a trademark that may be challenged in an infringement action. *1-800 Contacts*, 414 F.3d at 408 (placing the plaintiff's "trademarks on any goods or services in order to pass them off as emanating from or authorized by [the plaintiff]" is the sort of "'use' . . . ordinarily at issue in an infringement claim"). Rather, the complaint alleges that after prospective dealers would contact Defendants (via the link on Defendants' website), Defendants would respond by sending an email that, among other things, invited the recipient to "check out . . . our manufacturing partner's site at www.z-modular.com." (Doc. 1 ¶¶ 49, 51; Doc. 3-9 at 2.) Thus, the challenged "use" of the Z Modular mark consists of falsely describing Z-Modular as a "manufacturing partner" and then providing a link to Z-Modular's own website, where Z-Modular has posted its own mark.

Plaintiffs assert, without any supporting authority, that "[d]irecting prospective dealers to Z-Modular's advertisements that extensively use the [Z-Modular mark] by a link in an email, while representing that any product sold is and will be manufactured by Z-Modular, is no different than using [the mark] directly in the email." (Doc. 1 ¶ 53.) This *ipse dixit* fails to satisfy Plaintiffs' burden under the second and third *Eitel* factors. There is a broad body of caselaw addressing when a reference to a competitor's website may

---

[7] Section 1114 applies only when there is "a registered mark," so Plaintiffs could not bring a cause of action under that section as to VectorBloc.

- 10 -

constitute an infringing use under the Lanham Act. Depending on the facts, such conduct may indeed qualify. *See, e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1041 (9th Cir.1999) (defendant violated the Lanham Act by using a competitor's "trademark in the domain name of its web site and in its web site's metatags"). Nevertheless, not every reference to a competitor's name or website qualifies. *See, e.g., Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, 331 F. Supp. 3d 1131, 1139-40 (D. Idaho 2018).

Given this backdrop, it was incumbent upon Plaintiffs to provide citations and analysis in their motion for default judgment demonstrating that the conduct at issue constitutes trademark infringement under Section 1114(1) of the Lanham Act. Although the factual allegations in the complaint describe conduct that is certainly tortious and improper, not all such conduct falls within the ambit of Section 1114(1) and this is not a typical infringement case. Thus, given Plaintiffs' failure to meet their burden under the second and third *Eitel* factors, their motion for a default judgment as to Count Two will be denied without prejudice. *Cf. T-Cetra, LLC,* 2017 WL 7156250 at *1; *Bank of New York Mellon,* 2018 WL 6788858 at *1. Again, it's possible the challenged conduct does constitute counterfeiting under Section 1114(1)—the narrow ruling reached here is that Plaintiffs needed to provide more fulsome briefing (which they understandably declined to do, in light of the financial realities of this case) if they wished to prevail in the default-judgment context.

### ii. **Count Three**

In Count Three, Plaintiffs assert a claim for "Unfair Competition By Use Of The VectorBloc Mark," "in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." (Doc. 1 ¶¶ 88-95.)

Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the

affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

"Section 1125(a) . . . creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). "False association" appears to be synonymous with "false designation of origin" or "passing off." *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980).

Section 43(a) of the Lanham Act "prohibits a broader range of practices than does § 32." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 858 (1982). Among other things, it "applies to both registered and unregistered" marks. *Brookfield Commc'ns,* 174 F.3d at 1046 n.6. *See also Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1053 (9th Cir. 2019) ("[E]ven though the Lanham Act is known as the federal trademark statute, not all claims brought under the statute involve trademarks. . . . [Section] 1125(a) is one of the few provisions that goes beyond trademark protection.") (citation and internal quotation marks omitted). Thus, "false designation of origin" is "a federal remedy against the deceptive use of unregistered trademarks to designate falsely the origin of goods ('passing off')." *Job's Daughters,* 633 F.2d at 917.

As an initial matter, Plaintiffs do not specify whether their claim in Count Three is a claim for false association under Section 1125(a)(1)(A), a claim for false advertising under Section 1125(a)(1)(B), or both. Instead, they describe it as a claim for "unfair competition"—a term that doesn't appear in the text of Section 1125(a). In any event, because paragraph 90 of the complaint contains a specific reference to "a false designation of origin," and because (as discussed below) the liability analysis under Section

1125(a)(1)(A) is relatively straightforward, the Court will construe Count Three as a false association claim.

A Lanham Act claim for false association under Section 1125(a)(1)(A) has the following elements:

1) the defendant used a word, term, name, symbol, or device (or any combination thereof) or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact;

2) the usage was in commerce, in connection with goods or services;

3) the usage is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person; and

4) the plaintiff has been or is likely to be injured as a result of the usage.

*See* 15 U.S.C. § 1125(a)(1)(A).

Here, through February 2019, Marker published a photograph of a VectorBloc connector on the www.evomicrocondos.com website, along with text identifying the connector as VectorBloc and describing how it works. (Doc. 1 ¶ 59; Doc. 3-4 at 3.) When the www.evomicrocondos.com website first became affiliated with GreenFeet, it still included a picture of a VectorBloc connector and information about VectorBloc connectors. (Doc. 3-6 at 8.) Thus, Plaintiffs have clearly established the first three elements of a Section 1125(a)(1)(A) false association claim. Defendants used the word "VectorBloc," and its image, on their website advertising their goods and services. Online advertisements are "in commerce." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 n.3 (9th Cir. 2011). Defendants' use of the word "VectorBloc" and its image was likely to cause confusion or deceive viewers into believing that Defendants were associated with Plaintiffs, that Defendants' goods originated with Plaintiffs, and/or that Plaintiffs sponsored or approved of Defendants' services.

The problem with the Section 1125(a)(1)(A) claim is that it is unclear whether Plaintiffs have satisfied the fourth element—actual injury or a likelihood thereof.[8] No

---

[8] The same would be true if Count Three were construed as a false advertising claim

allegations in the complaint establish actual damage—for example, Plaintiffs do not contend they lost any sales. All references to damages are vague. (*See, e.g.*, Doc. 1 ¶¶ 76, 93, 95, 105.) And at any rate, the Court cannot accept as true allegations in the complaint as to damages, which require proof. *Geddes*, 559 F.2d at 560.

Plaintiffs' motion for default judgment provides a bit more detail. It seeks damages as to Count Three in the amount of $108,000. (Doc. 31 at 8.) The explanation for this figure is as follows: "$108,000 . . . is equivalent to Plaintiffs['] potential profits from selling 72 geographical sales districts at $1,500 per district." (*Id.*)

There are several problems with this approach. First, there is no evidence that Defendants actually signed up any dealers (let alone procured a $1,500 dealer fee from any of those dealers) in each of the 72 geographical areas that Evo claimed were "needed." The $108,000 figure thus represents the theoretical amount that Defendants *hoped* to obtain through their scheme, not the amount they *actually* obtained. Second, even if Defendants did collect some dealer fees, those fees are not synonymous with Plaintiffs' lost profits or sales. It appears Defendants were attempting to rip off third parties by inducing them to pay a one-time dealer fee in return for the right to serve as Plaintiffs' exclusive dealer in a particular region of the country. The direct victims in this scheme were the dealers, not Plaintiffs. Although it's possible the scheme may have also caused Plaintiffs to suffer a less direct injury (such as harm to reputation or goodwill), Plaintiffs have not proffered any evidence of such injuries.

In sum, Plaintiffs' $108,000 damage figure seems to be a theoretical disgorgement calculation. Although the Lanham Act permits a plaintiff that "cannot quantify its losses with sufficient certainty to recover damages" to seek "disgorgement of the defendant's ill-gotten profits under § 1117(a)," *Lexmark*, 572 U.S. at 135-36, Plaintiffs have cited no authority suggesting they may recover, under a disgorgement theory, Defendants' attempted-but-unrealized profits. And although the Lanham Act also permits a plaintiff that cannot quantify its losses to seek "injunctive relief under § 1116(a) (assuming it can

under Section 1125(a)(1)(B).

prove a likelihood of future injury)," *Lexmark*, 572 U.S. at 135-36, there is no likelihood of future injury as to Count Three because the website Defendants used (www.evomicrocondos.com) appears to be defunct and, as Plaintiffs' counsel acknowledged during oral argument, the challenged conduct does not appear to be ongoing.

Accordingly, Plaintiffs have failed to meet their burden under the second and third *Eitel* factors, so their motion for a default judgment as to Count Three will be denied without prejudice.

### iii. **Count Eight**

In Count Eight, Plaintiffs assert a claim for "Copyright Infringement" pertaining to Defendants' "acts of stealing and re-publishing the Copyrighted Works without Zekelman's permission." (Doc. 1 ¶¶ 133-38.)

A plaintiff asserting a claim for copyright infringement must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 361 (1991). "Registration is prima facie evidence of the validity of a copyright." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 488–89 (9th Cir. 2000).

Zekelman owns the Copyrighted Works,[9] which have been registered with the United States Copyright Office. (Doc. 1 ¶¶ 37-39.) The videos are original (*id.*) and they contain graphic renderings of modular steel units (*id.*), which are original. *Feist,* 499 U.S. at 345 ("[T]he requisite level of creativity [required to constitute an original work] is extremely low; even a slight amount will suffice.").

Before GreenFeet was incorporated, Marker published the Copyrighted Works in full on the www.evomicrocondos.com website. (Doc. 1 ¶ 60.) Furthermore, "at some point," Marker "and/or" GreenFeet took an image from a frame of the Build Stronger Graphics video (one of the Copyrighted Works), altered it (by removing the color red and flipping the image horizontally), and posted the altered image on the website. (*Id.* ¶ 61.) The altered image existed on the www.evomicrocondos.com website as of March 5, 2019,

---

[9]       Z-Modular does not appear to have standing to bring this claim.

at which point the website listed an address for GreenFeet. (*Id.* ¶¶ 47, 61; Doc. 3-7 at 4.) Publication of the altered image violated Zekelman's copyright, *cf. Friedman v. Guetta*, 2011 WL 3510890, *4-5 (C.D. Cal. 2011), and of course, publication of the Copyrighted Works in full did as well.

Given these allegations (which must be accepted as true), Defendant Marker infringed Zekelman's valid copyright of the Build Faster Graphics video and both Defendants infringed Zekelman's valid copyright of the Build Stronger Graphics video.

Thus, with respect to Count Eight, Plaintiffs have met their burden under the second and third *Eitel* factors.

### v. Conclusion as to the *Eitel* Factors

For the reasons stated above, default judgment is appropriate only as to Zekelman's claim for copyright infringement in Count Eight.

### B. Damages

For the copyright infringement claim, Zekelman seeks $60,000 in statutory damages ($30,000 for infringement of each of the two Copyrighted Works) instead of actual damages or Defendants' profits. (Doc. 31 at 8, 13.) *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990) ("Under the 1976 Copyright Act, the plaintiff may elect to recover either actual or statutory damages.").

Under the Copyright Act, the Court has wide discretion in assessing statutory damages. Section 504(c) permits "an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just," or up to as much as $150,000 where the infringement is "willful." The Court is "constrained only by the specified maxima and minima," and should consider "what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like." *Peer Int'l*, 909 F.2d at 1336.

The Court finds that Defendants' infringement of the Copyrighted Works was

willful—Marker stole video material directly from Zekelman's website and published that material (in full and altered form) in an improper attempt to procure $108,000 of dealer fees.

On the other hand, there is no indication that Defendants' scheme was in any way successful or that more than a handful of people ever visited Defendants' website and viewed the infringing publications of the Copyrighted Works. To be clear, the statutory award need not bear any relationship to actual damages. *F. W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952) ("Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."). Nevertheless, courts often award statutory damages on the lower end of the permissible range, even for willful violations with serious ramifications. *See, e.g.*, *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1072-73 (D. Ariz. 2006) (awarding $6,000—$3,000 per infringement—as statutory damages for willful infringement in a default judgment where the "means of infringement—an online media distribution system with tens of millions of potential users—has left [plaintiff's copyrighted works] vulnerable to massive, repeated, and worldwide infringement," where "it is likely that the actual number of works infringed by [defendant] is greater than the two brought in this action," and where defendant's conduct was essentially a few drops in the digital piracy bucket, which as a whole was "estimated to have cost the motion picture industry in excess of $858.5 million"). Furthermore, statutory damages "are not intended to serve as a windfall to plaintiffs" in the default judgment context. *UN4 Prods., Inc. v. Primozich*, 372 F. Supp. 3d 1129, 1135 (W.D. Wash. 2019) (awarding the minimum statutory penalty of $750).

The Court finds that the conduct at issue here was serious enough to merit an award to Zekelman of $5,000 per infringement, for a total of $10,000 in statutory damages. Defendant Marker is solely liable for paying the $5,000 award for infringing the Build Faster Graphics video, and both Defendants are jointly and severally liable for paying the $5,000 award for infringing the Build Stronger Graphics video. Finally, Defendants are

specifically warned that, if they were to engage in future acts of infringement, the findings contained in this order would likely result in a much higher statutory damage award in light of their status as recidivists.

## C. **Permanent Injunction**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "[A] plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"The Copyright Act provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.'" *Id.* at 392 (quoting 17 U.S.C. § 502(a)). But the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 392-93.

### 1. <u>Irreparable Injury</u>

"[T]here is no presumption of irreparable harm with respect to permanent injunctions."[10] *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011). "[H]arm to . . . reputation and goodwill, *supported by compelling evidence*, is sufficient to establish irreparable harm." *Id.* at 949 (emphasis added). "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

---

[10] This quotation omits the district court's reference to a no-longer-valid exception for trademark infringement. *Herb Reed, Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (no presumption of irreparable harm based solely on a strong case of trademark infringement).

Plaintiffs have alleged harm to their reputation and goodwill in conclusory fashion but acknowledged during oral argument that they have no evidence of such harm.[11] Therefore, Plaintiffs have not established irreparable injury.

### 2. Adequacy of Legal Remedies

"District courts must ascertain whether remedies available at law, such as monetary damages, are inadequate to compensate for the injury suffered." *Apple*, 673 F. Supp. 2d at 949. Monetary damages are inadequate where, for example, there is good reason to believe the infringement will continue. *Id.* at 950 ("[M]onetary damages would not prevent [defendant] from continuing to infringe [plaintiff's] copyrights . . . in the future . . . ; indeed, [defendant's] actions throughout this litigation and statements at oral argument reveal a dogged determination to continue . . . .").

Here, as noted, the website Defendants once used (www.evomicrocondos.com) appears to be defunct and Plaintiffs have not established that any of the conduct alleged in the complaint is ongoing. Indeed, this litigation appears to have scared Defendants out of business. Thus, the legal remedy of damages appears adequate to punish Defendants for infringing Zekelman's Copyrighted Works. Defendants are again warned, however, that if they were to resume their misconduct following the issuance of this order, they would be exposing themselves to significantly increased sanctions.

### 3. Balancing of the Hardships

Where there is no indication the challenged conduct will continue, this factor is essentially neutral—Plaintiffs have little to gain from the issuance of a permanent injunction, and Defendants have little to lose from being enjoined from doing something they aren't doing anymore.

### 4. Effect on the Public Interest

"If a less drastic remedy . . . [is] sufficient to redress [an] injury, no recourse to the

---

[11] The forwarding of the Jan. 10 email by a potential dealer's brother may show confusion, but it does not establish irreparable harm. *Herb Reed Enterprises*, 736 F.3d at 1250 ("Even if we comb the record for support or inferences of irreparable harm, the strongest evidence . . . is an email from a potential customer . . . [the content of which] simply underscores customer confusion, not irreparable harm.").

additional and extraordinary relief of an injunction [is] warranted." *Monsanto*, 561 U.S. at 165–66. The public has no interest in the issuance of extraordinary relief where it is not warranted. This factor is neutral.

### 5. Conclusion as to the *eBay* Factors

None of the *eBay* factors favor granting a permanent injunction regarding infringement of Zekelman's Copyrighted Works. Thus, the Court will vacate the preliminary injunction (Doc. 26) and will deny Plaintiffs' motion to the extent it seeks a permanent injunction.

### D. **Attorneys' Fees**

Under the Copyright Act, a district court has the discretion to award "a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. *See also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) ("[A]ttorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion."). In exercising this discretion, district courts are given "wide latitude." *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1229 (9th Cir. 1997). Courts consider the following non-exhaustive list of factors when determining whether to grant attorneys' fees: "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence." *Id.*

Here, Zekelman prevailed on its copyright infringement claim, so that claim obviously wasn't frivolous. Zekelman also acted with appropriate motives—one of the Copyright Act's goals "is to discourage infringement," *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994), and this suit does that. Indeed, Defendants effectively forced Zekelman to file this lawsuit by refusing to acknowledge, let alone respond to, the cease-and-desist letter. Finally, Defendants asserted no factual or legal arguments (and therefore the non-existent arguments are neither reasonable nor unreasonable). Thus, the first four factors weigh in favor of granting attorneys' fees.

The final factor is neutral. On the one hand, the award of $10,000 in statutory

damages should, standing alone, deter future misconduct by Defendants. On the other hand, Defendants could have avoided litigation by responding to the cease-and-desist letter, and it also appears (based on Plaintiffs' counsel's statements during oral argument) that Defendants played games when it came to service. Defendants should not be rewarded for running up Plaintiffs' fees in a case in which Plaintiffs were the clear victims of intellectual property violations.

Balancing these factors, the Court will award some attorneys' fees to Plaintiffs, but not the entire $67,473.75 they seek. Calculating the reduced sum is more art than science, but it seems appropriate, in the Court's discretion, to discount Plaintiffs' request based on the fact that they only secured a default judgment on one of the eight claims in the complaint[12] and based on the observation that 178.35 hours of attorney time seems high for a case resulting in a default judgment, even though Defendants helped contribute to those hours through their gamesmanship.[13] Accordingly, the Court will award $20,000 in attorneys' fees.

Accordingly,

**IT IS ORDERED:**

(1)     Plaintiffs' motion for default judgment (Doc. 31) is **granted in part and denied in part**;

(2)     There being no just reason for delay, the Court enters judgment in favor of Plaintiff Zekelman on Count Eight of the complaint;

(3)     Plaintiff Zekelman is awarded $5,000 in statutory damages against Defendant Marker for infringement of Zekelman's valid copyright of the Build Faster Graphics video;

---

[12]     *Cf. The Traditional Cat Ass'n, Inc. v. Gilbreath*, 340 F.3d 829, 834 (9th Cir. 2003) ("If the district court determines that the copyright and non-copyright claims are not related, the defendants cannot recover fees for the non-copyright claims, but the district court must attempt to arrive at a fair apportionment and then calculate a reasonable fee award.").

[13]     *Cf. Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.").

(4)     Plaintiff Zekelman is awarded $5,000 in statutory damages against Defendant Marker and Defendant GreenFeet, jointly and severally, for infringement of Zekelman's valid copyright of the Build Stronger Graphics video;

(5)     Plaintiff Zekelman is awarded $20,000 in attorneys' fees against Defendant Marker and Defendant GreenFeet, jointly and severally;

(6)     The preliminary injunction (Doc. 26) is **vacated**;

(7)     Plaintiffs' request for a permanent injunction (Doc. 31) is **denied**; and

(8)     Plaintiffs shall have 14 days from the issuance of this order to file a renewed motion for default judgment on Counts One through Seven of the complaint (and Z-Modular may renew its request for default judgment on Count Eight of the complaint).  If no such motion is filed, the Clerk of Court shall terminate this action and enter judgment accordingly.

Dated this 26th day of March, 2020.


Dominic W. Lanza
United States District Judge

- 22 -